UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:09-00006 |
| | ) | JUDGE CAMPBELL |
| STACY CARL EVANS | ) | |

MEMORANDUM AND ORDER

I. Introduction

Pending before the Court is Defendant's Motion To Suppress (Docket No. 58). Through the Motion, the Defendant seeks to suppress a statement he made to law enforcement because he argues it was obtained in violation of his Fifth Amendment rights. The Court held a hearing on the Motion on May 16, 2012. For the reasons stated herein, the Motion is DENIED.

Through a prior Order (Docket No. 48), the Court granted the Defendant's Motion To Reconsider The Order Denying Defendant's Motion To Dismiss The Indictment And To Have An Evidentiary Hearing (Docket No. 42) with regard to Defendant's Sixth Amendment speedy trial/post-indictment challenge, and the four factors under Barker v. Wingo, 407 U.S. 514, 523-30, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The Court held the requested evidentiary hearing on May 16, 2012. For the reasons stated herein, Defendant's Sixth Amendment speedy trial/post-indictment challenge is DENIED.

II. Factual and Procedural Background

At the hearing on May 16, 2012, the Government called three witnesses: Tennessee Bureau of Investigation ("TBI") Agent Michael E. Frizzell, TBI Agent Michael Burnette, and

Jason Poore, formerly an agent with the Tennessee Alcoholic Beverage Commission ("ABC").

Agent Frizzell testified that in July, 2004, he was assigned, as a TBI agent, to an area that included Pickett County, Tennessee. During July, 2004, Agent Frizzell testified that he and other law enforcement officers executed a search warrant at the Defendant's farm in Pickett County. At that time, Agent Frizzell said, the Defendant's father was the Sheriff of Pickett County. According to Agent Frizzell, the Sheriff was not told about the search warrant prior to the day it was executed. On the day of the search, Agent Frizzell testified, the Sheriff came to the scene, but he was not asked by any law enforcement officers to question his son, the Defendant.

Agent Frizzell testified that, in 2005, he was assigned to a different area of the state, one that no longer included Pickett County.

After the Defendant was indicted in this case, in July, 2009, Agent Frizzell testified that he tried to arrange for the Defendant's arrest, though he was no longer assigned to Pickett County at that time. Agent Frizzell testified that he knew the Defendant was living in Kentucky at that point, and he did not believe he had arrest authority in that state. According to Agent Frizzell, he contacted the Marshals Service in Nashville, Tennessee, but was only able to reach voicemail. Agent Frizzell testified that he also contacted a deputy in the Putnam County Sheriff's Office, who served on the Marshals Service task force and whose area included Pickett County, about arresting the Defendant. The deputy told him he would check with his supervisors about it. Agent Frizzell said that he received no follow-up response from the Putnam County deputy.

On cross examination, Agent Frizzell testified that he believed the Marshals Service

would have the authority to arrest the Defendant because he was living out of state. Agent Frizzell testified that he called the Marshals Service in Nashville three to four times, and called the Putnam County deputy one time. Agent Frizzell said that he did not call the Pickett County Sheriff's Office, and that he knew of nothing the Defendant did to prevent execution of the arrest warrant. Agent Frizzell testified that he did not look for the Defendant until the Indictment was issued.

Agent Burnette testified that his office is in Cookeville, and that he is assigned to an eight-county area that covers Pickett County. In 2009, Agent Burnette testified, he was contacted by the Government's attorney in this case, Harold B. McDonough, and asked if he would assist as they were having difficulty in serving an arrest warrant on the Defendant. Agent Burnette testified that he did not believe he had arrest authority in Kentucky. According to Agent Burnette, he then contacted a deputy in Cookeville who served on a task force for the Marshals Service, and asked if he would help. The Cookeville deputy told Agent Burnette he had already looked into it once and there was no way they could help.

Agent Burnette testified that he then contacted a Pickett County Sheriff's Deputy, Jeff Flowers, to ask if he would arrest the Defendant when he visits Pickett County, and told the deputy that he or the Marshals Service would then come and pick him up. According to Agent Burnette, the deputy later told him that he checked and could not help, though he did not give details as to why he could not help. Agent Burnette testified that the Pickett County Sheriff at that time, Sheriff Dowdy, had served as Chief Deputy when the Defendant's father was Sheriff.

Agent Burnette testified that he then called the Kentucky State Police, and they told him

that the Defendant had been involved in an incident that day or the day before and that they were aware of him. They told Agent Burnette that they might be able to help, but would have to go through the Marshals Service there. Agent Burnette testified that, as directed, he then called the Marshals Service in Bowling Green, Kentucky, and after some delay, spoke with them about helping with the execution of the arrest warrant on the Defendant. According to Agent Burnette, he received a return call a week later, and was told that they could not find an arrest warrant for the Defendant in their computer system, and therefore, they could not arrest him.

Agent Burnette testified that he then contacted Government's counsel, Mr. McDonough, to try and determine why the Bowling Green Marshals Service could not find the arrest warrant. Later, he was told that the warrant had been coded as a "Northeastern" division case and the Marshals Service was looking for a "Nashville" division case. According to Agent Burnette, the Bowling Green Marshals Service eventually called him and said they had tracked down the arrest warrant for the Defendant. Ultimately, Agent Burnette testified, the Kentucky State Police and the Marshals Service in Bowling Green served the arrest warrant on the Defendant. Agent Burnette testified that the Defendant's residence in Kentucky was approximately two hours away from Bowling Green, which added to the delay in serving the arrest warrant. According to Agent Burnette, these efforts to effect execution of the arrest warrant occurred over months.

On cross examination, Agent Burnette testified that he could not recall the date of Mr. McDonough's initial call, and explained that all his electronic mail messages from that period had been destroyed.

Agent Poore testified that he is currently a special agent with the bomb and arson station of the Tennessee State Fire Marshal's Office. Prior to his current job and in July 2004, Agent Poore testified, he was a special agent with the ABC, and served on a task force of various law enforcement agencies charged with marijuana eradication. Agent Poore testified that he was present at the execution of the search warrant at the Defendant's farm in Pickett County, and one of his duties was to assist with scene security.

Agent Poore testified that after the Defendant was arrested, he was charged with the task of watching the Defendant as the search warrant was executed. Agent Poore could not recall if the Defendant was handcuffed. Agent Poore testified that he did not read the Defendant his Miranda rights, but that another officer, Alex Rodriguez, did, according to his report. Agent Poore testified that the officers did not try to question the Defendant at the scene.

At some point, Agent Poore stated, the Defendant's father, Sheriff Carl Evans arrived. According to Agent Poore, Sheriff Evans was not involved in the investigation. Agent Poore testified that he believes his supervisor, S.A. Joe Copeland, arrived with the Sheriff. Agent Poore testified that he saw the Sheriff and others enter the barn where the marijuana-growing operation had been discovered, and after about 15 minutes, the Sheriff approached him and asked to speak to his son. Agent Poore testified that he agreed but told him they would have to stay there. At that point, Agent Poore testified, the Defendant stood up from where he was sitting, and the Defendant and his father walked a few feet away and had a conversation. According to Agent Poore, he could hear a few words of the conversation, but could not hear all they discussed.

When the Defendant and his father returned, Agent Poore, referring to his report, testified that the Sheriff advised he wanted to ask the Defendant some questions and he wanted Agent Poore to hear them. Agent Poore testified that the Sheriff turned to his son and said "I understand that you requested a lawyer, and that was the right thing to do, son, but I want you to answer my questions and I want him [pointing at Agent Poore] to hear it." Agent Poore read from his report:

> Sheriff Evans asked Stacy, 'Is the the (sic) first time you did this, it is isn't it?' Stacy responded, 'yeah, dad, the first time.' The sheriff then asked 'How long have you been doing this?' Stacy replied, 'Not long.' The sheriff then asked, 'How do you get your clones?' Stacy replied, 'from just cuttings, dad.' The Sheriff asked if there was a mother plant. Stacy replied, 'no, I cut from what was in there.' Sheriff then said, 'there isn't anymore plants anywhere else is there,' and Stacy advised 'no, dad.' The Sheriff then turned to me and advised just from what he had heard, you could just start plants from cuttings, so he did not think there was a mother plant either.

(Exhibit 1 to Hearing (also filed at Docket No. 58-1)).

Agent Poore testified that the terms "mother plant" and "clones" referred to a technique for obtaining higher-grade marijuana. Agent Poore explained that, later, S.A. Copeland told him that he had had a disagreement with the Sheriff about whether there was a mother plant in the barn.

Agent Poore testified that he did not ask the Sheriff to speak with the Defendant, and that, to his knowledge, no other officers did. Agent Poore said that he did not ask the Defendant any questions, but only talked with the Defendant about people they knew in common.

On cross examination, Agent Poore testified that the Sheriff was wearing a uniform, but he could not recall if he was wearing a gun. Agent Poore could not recall from memory which

6

TBI agent had arrested the Defendant, or who had read him his Miranda rights. He testified that there were about ten officers at the scene, and that they were wearing protective vests. At some point, Agent Poore said, the Sheriff's Chief Deputy arrived at the scene, along with a defense attorney. Agent Poore testified that he was aware the Defendant had requested an attorney, and he had not questioned him. Agent Poore stated that the Sheriff was not part of the investigation. Agent Poore pointed out that when the Defendant spoke, he kept referring to the Sheriff as "dad," and the Sheriff referred to the Defendant as "son."

The defense called three witnesses at the hearing: Carl Evans, the Defendant's father; Dana Dowdy, who currently serves as Sheriff of Pickett County; and David Cross, an attorney from Albany, Kentucky.

Mr. Evans testified that he is the Defendant's father, and will be 70 years old later this year. He stated that he is diabetic, and that his memory is not very good. In 2004, at the time of the Defendant's initial arrest by state authorities, Mr. Evans testified, he was serving as Sheriff of Pickett County, and had held that office since 2000. According to Mr. Evans, he served as Sheriff until 2006.

On the day the search warrant was executed and the Defendant was arrested, Mr. Evans testified that he recalled being at the barn on his son's property, but does not recall asking to speak with his son, or asking him about growing marijuana in his barn. Mr. Evans testified that he did recall being told that his son had asked for a lawyer. Mr. Evans said he recalled seeing the lawyer at the scene, and he must have called him, but he does not recall doing so.

According to Mr. Evans, his son has lived in Albany, Kentucky since 2004. Since the

7

Indictment was issued, Mr. Evans testified, his son has visited him in Pickett County about once a month. Mr. Evans testified that his son has was not in hiding during 2009 and 2010.

Mr. Evans testified that he and Steve "Babe" Ferguson installed electrical wiring in the barn on the Defendant's property some time after the Defendant bought the farm in 2003. Mr. Evans testified that Mr. Ferguson built gates and performed maintenance work on his son's farm during May, June and July, 2004. As part of that work, Mr. Evans said, Mr. Ferguson was in and out of the barn where the marijuana-growing operation was discovered. According to Mr. Evans, Mr. Ferguson had spent time in prison, and was rumored to have been involved in growing marijuana, and had shot a man. Mr. Evans testified that at some point, Mr. Ferguson had sold some property to Bill Armstrong, and that Mr. Armstrong had told him he found evidence of a marijuana-growing operation in the barn on that property. According to Mr. Evans, Mr. Ferguson died of cancer in January, 2010, and Mr. Armstrong died of cancer in 2010 or 2011.

On cross examination, Mr. Evans testified that he was not aware of the TBI investigation of his son until he received a call about the search warrant on the day it was executed. He stated that he observed the marijuana-growing operation in the Defendant's barn, and recalled discussing something about a mother plant with S.A. Copeland. When he arrived at the scene, Mr. Evans testified, his son was already there. Mr. Evans testified that he does not recall speaking with his son, and that he does not recall his son admitting his involvement in growing marijuana to him. Mr. Evans testified that marijuana was also found on the Defendant's property in Kentucky. Mr. Evans stated that he did not investigate or arrest Mr. Ferguson for growing marijuana.

Pickett County Sheriff Dana Dowdy testified that he has been employed in the Sheriff's Department since 1998, and was elected Sheriff in August 2010. Sheriff Dowdy testified that he has known the Defendant all his life, and that he has seen him in Pickett County from time to time since 2009. He said he was not aware of anyone ever asking for his help in finding the Defendant. Sheriff Dowdy testified that he would have helped, if asked.

On cross examination, Sheriff Dowdy testified that he was a Road Deputy when the Defendant's father served as Pickett County Sheriff. He said he was not present at the execution of the search warrant on Defendant's property because his wife was sick at the time. Sheriff Dowdy testified that he has a deputy named Flowers who is assigned to a task force in Cookeville.

David Cross testified that he has been an attorney in Albany, Kentucky since 1984. Mr. Cross testified that he knows the Defendant, has coached his sons in baseball, and has represented him in Kentucky. Mr. Cross testified that the case against the Defendant "on similar facts" in Kentucky has been dismissed and expunged. According to Mr. Cross, his office is five miles from Pickett County, Tennessee.

Mr. Cross testified that he had known Mr. Ferguson. According to Mr. Cross, Mr. Ferguson had a Kentucky conviction for cultivating marijuana after he returned from service in Viet Nam. Mr. Cross testified that Mr. Ferguson had a reputation in the community for being involved in marijuana for many years, and that Mr. Ferguson and his brother had been in prison for shooting a man named Shaw Huddleston. Mr. Cross stated that he knew Mr. Ferguson sold some property to Mr. Armstrong, but had not heard the rumor about what was found in the barn. Mr. Cross testified that Mr. Ferguson died about three years ago.

9

III. Analysis

A. Sixth Amendment Speedy Trial Issue

As the Court explained in a prior Memorandum and Order (Docket No. 41), the Sixth Amendment guarantees an accused in a criminal prosecution "the right to a speedy and public trial." U.S. Const. Amend. VI. In Barker v. Wingo, 407 U.S. at 523-30, the Supreme Court established a four-factor test for determining whether the Sixth Amendment's speedy trial guarantee has been violated: (1) whether the delay was uncommonly long; (2) the reason for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether prejudice resulted to the defendant. If a court concludes that a speedy trial violation has occurred, the remedy is dismissal with prejudice. United States v. Jackson, 473 F.3d 660, 664 (6th Cir.2007); United States v. Williams, 231 Fed. Appx. 457 (6th Cir. Aug. 10, 2007).

In applying the Barker factors, the Court has previously determined that because the delay between the issuance of the Indictment, on July 1, 2009, and the first trial setting, February 1, 2011, was over a year, the delay was uncommonly long, or presumptively prejudicial, under United States v. Watford, 468 F.3d 891, 901-02 (6th Cir. 2006). (Docket No. 41, at 3-5; Docket No. 48, at 3).[1] That presumption, under Watford, required the Court to examine the three other

---

[1] At the hearing, counsel for the Defendant suggested that the Court should consider the "triggering date" as the initial arrest by state authorities, on July 8, 2004, rather than the date the Indictment was issued in this case. To support his argument, the Defendant cites United States v. DeTienne, 468 F.2d 151, 155 (7th Cir. 1972), in which the court suggests that a date prior to the issuance of the federal indictment might be considered if "the crimes for which a defendant is ultimately prosecuted really only gild the charge underlying his initial [state] arrest and the different accusatorial dates between them are not reasonably explicable." Otherwise, the court explained, "[i]t would be absurd in the extreme if an arrest on one charge triggered the Sixth Amendment's speedy trial protection as to prosecutions for any other chargeable offenses." Id. Defendant has failed to show that the charge brought in this case "only gilds" the state charges

10

factors set forth in Barker. As for whether the Defendant asserted his right to speedy trial, the Court has already determined as follows:

> Defendant was arrested, made an initial appearance, and was appointed counsel on December 2, 2010. (Docket Nos. 4-6). The pending motion was filed on February 6, 2012. The trial has been continued three times at the request of the Defendant. (Docket Nos. 12, 21, 37). Defendant's delay in asserting his right to a speedy trial weighs against him.

(Docket No. 41, at 4). The remaining two Barker factors were the subject of the Defendant's request for reconsideration and the evidence offered at the hearing.

As for the reason for the delay, the Barker Court provided guidance regarding how this factor is to be weighed:

> A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

407 U.S. at 531. The Sixth Circuit has explained that a "bad faith delay" is "one in which the prosecution uses delay to 'gain some impermissible advantage at trial.'" Watford, 468 F.3d at 904 (quoting Doggett v. United States, 505 U.S. 647, 656, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992)).

The testimony of Agent Frizzell and Agent Burnette at the hearing does not support a finding of deliberate or bad-faith delay in this case. The Court concludes that the delay was

---

underlying his initial arrest, and that the different charging dates are not reasonably explained. Thus, the Court declines to reconsider its decision that the triggering date for the Sixth Amendment post-indictment/speedy trial challenge in this case is the date the Indictment was issued.

11

principally attributable to the additional administrative requirements attending the service of an arrest warrant in another state. As the Court found in its prior Memorandum and Order (Docket No. 41, at 4), the delay is the fault of the Government, but it is not the result of incompetence or bad faith. Thus, this factor is weighted against the Government, but not heavily.

With regard to prejudice to the Defendant, the Supreme Court has explained that in considering this factor, three interests are paramount: (1) preventing oppressive pretrial incarceration; (2) minimizing the anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired. Barker, 407 U.S. at 532; Watford, 468 F.3d at 907.[2]

The Defendant in this case has been released on bond pending trial. (Docket No. 8). In addition, the Defendant has not presented any evidence regarding his anxiety and concern. Thus, the first two interests do not indicate prejudice to the Defendant caused by the delay.

The Defendant does contend, based on the testimony adduced at the hearing, that his defense has been impaired because he can no longer call Mr. Ferguson and Mr. Armstrong to testify at trial. According to Mr. Evans, Mr. Ferguson died in January, 2010, approximately five months after the Indictment was issued in this case, and Mr. Armstrong died in 2010 or 2011. The Defendant presumably would have called Mr. Ferguson, a reputed marijuana cultivator, to support a theory of defense that Mr. Ferguson, not the Defendant, was responsible for the marijuana-growing operation discovered in the Defendant's barn in July, 2004. Defendant

---

[2] Prejudice is not presumed where the delay is attributable to negligence, as opposed to bad faith, unless the delay is substantially longer than that involved here. Cf. Brown v. Bobby, 656 F.3d 325, 337 (6th Cir. 2011)(No presumption with nineteen-month delay) with Doggett v. United States, 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1920)(Prejudice presumed with six-year delay).

12

would presumably have called Mr. Armstrong to testify that evidence of a marijuana-growing operation was discovered in a barn once owned by Mr. Ferguson.

The Defendant does not explain, however, why he did not pursue this theory of defense when he was arrested in July, 2004, and charged by state authorities with the same offense charged here. According to the Defendant, the state charge was still pending when the Indictment in this case was issued, and was not dismissed until November, 2011. (Docket No. 47-1). The fact that this charge was pending provided incentive for the Defendant to investigate possible avenues of defense, and the evidence indicates that he had legal representation available from his initial arrest to pursue such investigative leads. The Defendant's failure to pursue these witnesses and document their potential testimony in connection with the state charge during the approximately six-year period prior to their deaths undermines his claim of prejudice.

Furthermore, although these witnesses are clearly no longer available to the Defendant, the Court does not consider their testimony to be of great evidentiary value. The Defendant apparently seeks to use these witnesses to suggest that Mr. Ferguson was responsible for the marijuana-growing operation discovered in his barn. Under this theory of defense, the Defendant would presumably seek to demonstrate that Mr. Ferguson had sufficient access to the Defendant's barn to enable Mr. Ferguson to construct a marijuana-growing operation there without the knowledge of either the Defendant or his father, who was working with Mr. Ferguson on wiring the barn. In presenting this theory, even if the witnesses were currently available, the prosecution would likely point out Defendant's failure to urge authorities to investigate Mr. Ferguson as a suspect once the marijuana-growing operation was discovered in July, 2004, and the Defendant was accused rather than Mr. Ferguson. Also, there is no evidence

in the record that Mr. Ferguson would waive his constitutional rights and admit any criminal activity.

In conclusion, the evidence indicates that the 17-month delay between the issuance of the Indictment and the arrest of the Defendant was attributable to, at worst, negligence on the part of the Government.[3] On the other hand, the Defendant has not shown any significant impairment to his defense caused by the delay. Under these circumstances, the Court is not persuaded that the post-indictment delay in this case violates the Sixth Amendment speedy trial guarantee.

B. <u>Motion To Suppress</u>

The Defendant argues that the statements he made to Agent Poore on the day of his arrest should be suppressed. Defendant contends that the questioning by his father constitutes official custodial interrogation, which occurred after he invoked his right to counsel, and therefore, his responses to those questions were obtained in violation of his Fifth Amendment rights. The Government argues, on the other hand, that the Fifth Amendment does not protect the statements made by the Defendant because the Defendant's father was acting in a private capacity when he questioned the Defendant.

In <u>Edwards v. Arizona</u>, 451 U.S. 477, 101 S.Ct. 1880, 1884, 68 L.Ed. 2d 378 (1981), the Supreme Court held that law enforcement officers must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during custodial interrogation until a lawyer has been made available to the suspect or the suspect himself initiates further

---

[3] The Defendant has not specifically complained about the two-month period between his arrest on federal charges and the first trial setting. As noted above, the trial has been continued three times since that initial setting at the request of the Defendant.

communication, exchanges or conversations with the police.

To support its argument that there was no Fifth Amendment violation in this case, the Government cites Cook v. Warden, Georgia Diagnostic Prison, ___ F.3d ___, 2012 WL 1371276 (11th Cir. April 20, 2012). In Cook, the Eleventh Circuit held that the petitioner's confession to his father, who was a Special Agent with the FBI, but was not on duty or acting in an official capacity at the time, was admissible. The court explained that no Fifth Amendment violation occurs "when a suspect confesses to a family member who is employed in law enforcement, even when the family member – *acting in his private capacity* – urges the suspect to speak." Cook, 2012 WL 1371276, at *5 (quoting United States v. Gaddy, 894 F.2d 1307, 1312-13 (11th Cir. 1990)(emphasis in original). The court determined that such circumstances "are 'not the functional equivalent of government interrogation,' and the suspect's statements . . . were 'not given at the urging of or due to the exploitation by a [government] agent.'" Id. In reaching its decision, the court cited facts in the record indicating that the defendant's father was acting in a private capacity:

> First, although John Cook happens to have been an FBI agent, he was chiefly acting as Petitioner's father; John Cook had no involvement in the investigation of the murders. Before Petitioner confessed, Petitioner requested both his father and a lawyer. John Cook never 'offered'—that is, put himself forward to the state to act as a state agent—to speak with his son. Petitioner asked to speak to his father, and the father also merely asked permission to speak with his son: the father was not directed by a superior. John Cook also testified that he was not thinking of his job as an FBI agent at the pertinent time; instead he wanted to protect his son and possibly to convince his son to cooperate for leniency. At the meeting between father and son, there was crying, shaking, and hugging on the part of both men; such acts are typically absent in custodial interrogations.

Cook, 2012 WL 1371276, at *6.

In United States v. Gaddy, 894 F.2d at 1311-12, cited by the Cook court, the Eleventh

Circuit held that the defendant's [Danner's] confession was admissible, even though it was obtained at the urging of his aunt who was employed by the police department as a police officer. The court found that no police-initiated interrogation had occurred:

> The magistrate found that Janice Hernandez was not part of the investigative team on Danner's or Gaddy's case, was not directed by a superior to contact Danner, and acted solely out of concern for his welfare, and that there was no evidence that Hernandez was acting in the normal course of her duties when she initiated contact with her nephew; thus, she was not an agent of the government but acted as a private citizen. . . . Hernandez communicated with Danner, not to assist the police department in solving a crime, but to protect her nephew.
>
> . . . Likewise, by encouraging Danner to tell the police what he knew, she acted as a worried aunt who envisioned the hardship that could befall her nephew if he did not reveal the information he possessed, especially before Gaddy rendered his version of the events to the police. The evidence shows that at the time Hernandez contacted Danner she was employed by the Chatham County Police Department, but that even though she was a police officer, her duties were not investigative in nature. She contacted Danner of her own accord, not at the direction of a superior and not for the benefit of the police department. She made no written report following that communication, as would have been customary had Hernandez been acting in an official capacity. Thus, no police-initiated interrogation occurred.

894 F.2d at 1311 (footnote omitted). See also Van Hook v. Anderson, 488 F.3d 411, 420 (6th Cir. 2007)(Citing Gaddy for proposition that Edwards permits a third party to communicate a suspect's desire to initiate a discussion).

In this case, the evidence at the hearing indicates that law enforcement officers advised the Defendant of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and that he thereafter requested the assistance of counsel. The evidence further indicates that no officer at the scene who was involved in the investigation of the Defendant or the execution of the search warrant engaged in interrogation of the Defendant. Even after being approached by the Defendant and his father, there is no evidence that Agent Poore asked any

16

questions of the Defendant or did anything other than record what the Defendant said.

The evidence indicates that the only interrogation that occurred was initiated by the Defendant's father in his capacity as a father rather than as Sheriff. The evidence further indicates that Mr. Evans had no involvement in the investigation of the Defendant that led to the search warrant, nor was he requested by any law enforcement officer to question the Defendant. Furthermore, during the conversation between the Defendant and his father, there are frequent references to "dad" and "son," which further supports the non-official nature of the questioning. (See Exhibit 1). Under these circumstances, the Court is persuaded that no custodial interrogation by law enforcement personnel occurred after the Defendant invoked his right to counsel, and therefore, the Defendant's statements were not obtained in violation of the Fifth Amendment. Accordingly, Defendant's Motion To Suppress (Docket No. 58) is DENIED.

## IV. Conclusion

For the reasons set forth herein, the Court denies the Defendant's Motion To Suppress (Docket No. 58), and his renewed request to dismiss the Indictment on Sixth Amendment speedy trial grounds.

It is so ORDERED.

Todd Campbell
TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE
